Filed 9/11/20  Wacha v. Make-A-Wish Foundation of Orange County and the Inland Empire, Inc. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEFFREY A. WACHA, | |
| Plaintiff and Appellant, | G057187 |
| v. | (Super. Ct. No. 30-2017-00908687) |
| MAKE-A-WISH FOUNDATION OF ORANGE COUNTY AND THE INLAND EMPIRE, INC. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas A. Delaney, Judge.  Affirmed.

Carla Ford Law and Carla A. Ford; Pine Tillett Pine and Norman Pine for Plaintiff and Appellant.

Jackson Lewis P.C., Jared L. Bryan, Lina Nasry and Dylan B. Carp for Defendants and Respondents.

\*          \*          \*

Jeffrey A. Wacha appeals from the trial court's entry of judgment after granting the summary judgment motion filed by Make-A-Wish Foundation of Orange County and the Inland Empire, Inc. (Make-A-Wish or MAW) against Wacha's retaliatory termination and related claims.[1] Wacha premised his retaliation cause of action on a Labor Code provision applying to whistleblowers who report violations of state law. (Lab. Code, § 1102.5, subd. (b).) Wacha asserted that MAW's chief executive officer (CEO), Stephanie McCormick, terminated him because he planned to report to MAW's board of directors (Board) a budgetary shortfall, and also McCormick's allegedly improper use of a corporate credit card. According to Wacha, McCormick's delay in reporting the shortfall constituted a breach of her fiduciary duty to the corporation, and was, therefore, also a violation of state law, entitling him to protection against retaliatory termination for reporting law breaking conduct. The trial court determined Wacha failed to present sufficient evidence from which a jury could conclude the reasons MAW and McCormick gave for his termination were merely pretextual. The court's ruling also disposed of Wacha's intentional infliction of emotional distress (IIED) cause of action.

As we explain, the trial court did not err in granting MAW's summary judgment motion. We therefore affirm the judgment.

---

[1] In addition to suing Make-A-Wish as a corporation, Wacha also sued Stephanie McCormick and Michael Hickman in their capacities, respectively, as MAW's CEO and the chairman of its Board. We refer to the corporation and these individual defendants collectively as MAW or Make-A-Wish, unless the context indicates otherwise.

## FACTUAL AND PROCEDURAL BACKGROUND

Make-A-Wish employed Wacha for a little over four years, from November 2011 to March 2016. Wacha does not dispute that his employment was at-will, as reflected in his initial application, engagement letter, and employee handbook, nor was this arrangement ever altered. Wacha was hired as the company's director of finance and operations in 2011. In August 2014, he was promoted to vice-president of finance and operations. Wacha indicated, under that title, he served as chief financial officer in charge of the human resources department and served as the company's overall director of operations.

In October 2014, Make-A-Wish placed Wacha on a Performance Improvement Plan (PIP) to address conduct that included (1) intimidation of coworkers, including use of sarcasm that made staff "uncomfortable"; (2) "angry outbursts with the President & CEO in a public place"; (3) "angry outbursts with two additional employees," leaving them "feeling intimidated and hesitant to approach" him; (4) "missed recent crucial deadlines," including failure "to notify the CEO of these missed deadlines" despite direct requests for updates; (5) "repeatedly respond[ing] in a disrespectful and sarcastic manner" to colleagues; (6) sending "inappropriate and condescending emails . . . to key staff"; (7) "display[ing] anger" and being "argumentative and disrespectful to fellow colleagues"; and (8) failing to respond "to numerous email requests from colleagues for time-sensitive information."

Before the PIP was put in place, Wacha told fellow staff members that he believed he would be fired. But MAW did not fire him; instead it warned Wacha he must "present [himself] as a professional member of the leadership team and staff, demonstrating respectful and appropriate behavior," including to his "supervisor and peers" and all Make-A-Wish personnel. His PIP included an express warning that "[a]ny additional outbursts or disrespectful behavior to anybody will not be tolerated." Wacha

3

agreed during his deposition in this litigation that each of the reasons requiring the PIP as a corrective measure was warranted by the facts.

In a 30-day PIP review that Wacha now characterizes as marking his "complet[ion of] the PIP successfully" (italics omitted), his supervisor, McCormick, noted that the review was "interim" in nature and "intended to highlight your performance progress to date."

The review stated that Wacha had "[m]et all deadlines," made "a notable and positive change" in "[d]emonstrating respectful and appropriate behavior," and "[c]ompleted" an unspecified "[w]eekly meeting attendance" requirement. The review also highlighted "[p]rogress made" as to "[r]espectful attitude and spirit of cooperation with all Chapter personnel." The interim report contemplated a "mid-year performance review . . . in December" that either did not take place or is not included in our record. The report concluded with a "Comment" that was either pertinent to "[m]eeting deadlines for projects," which was the heading under which the comment was placed or, alternately, McCormick may have intended it to summarize the report as a whole. The comment stated, "At this time I see no need for additional action. His satisfactory performance will be so noted as part of the Performance Improvement Plan process."

MAW terminated Wacha in March 2016. According to MAW, it did so for a recurrence of troubling conduct in February 2016, involving three specific incidents.

First, on February 23, 2016, Director of Wish and Volunteer Services Melissa Gallagher requested a meeting with Wacha about safety concerns she and fellow staff had at Make-A-Wish's new satellite office in Riverside. Those concerns related to various people entering the facility to attempt to use the restrooms or telephones, while ignoring staff requests to leave. Gallagher approached Wacha, who was in charge of the physical facilities at the new office, to request installation of a buzzer system to control entry at the front door.

4

According to Gallagher, the meeting was marred by unprofessional outbursts from Wacha, who discounted the staff's safety concerns, disagreed with any notion of locking the doors, and disclaimed responsibility for dealing with the issue altogether. Gallagher subsequently complained to McCormick about Wacha's "unprofessional, unhelpful, and insulting response." As she recounted in an e-mail to McCormick, during the meeting, Wacha "became very agitated and advised me that it is up to [you, i.e., McCormick] and I if we wanted to keep the doors locked. He said he would not take any of the complaint calls regarding [keeping] the doors locked and that [you] and I would have to take those. [He] also mentioned that the girls [i.e., the Riverside staff] need to grow up and be adults."

Gallagher continued in the e-mail: "I tried to explain to [Wacha] that my concern is the girls and that I think it would be a huge liability to not follow through with at least a buzzer. [He] stated that it is up to [me] and [you]. This was a very unpleasant meeting and very unprofessional." An employee who had been in the mother's room next to Wacha's office during the meeting confirmed she overheard that Wacha viewed locking the doors as a "bad decision," and he "seemed to express strong feelings" against the idea, "especially because it was such a nice, new space."

McCormick tried to discuss Gallagher's concern and Wacha's response with him, but he refused to do so. He asked McCormick to "just move on" from the topic, stating he "didn't see what there was to talk about" while adding without explanation, "oh that's right, I'm the only one here who's allowed to feel unsafe" and that he "didn't want to discuss it because whatever I say you're going to take the wrong way."

The next day after Wacha's meeting with Gallagher, a second flashpoint of concern regarding his behavior arose in a meeting he had with McCormick. McCormick viewed comments Wacha made in the meeting as "insubordinate in nature" because, as MAW's chief financial officer, he did not have a budget forecast ready and cast the

5

blame on others. He denied responsibility for the delay, asserting it lay with an employee who did not provide information he needed, despite repeated requests.

McCormick did not accept the excuse: "During the conversation, I requested a cash flow forecast from [Wacha], to which he responded that he 'doesn't need to be part of the solution.' When I explained . . . that it was part of his job to do so, he responded that he was 'not going to play this game' with me. I responded by telling [him], 'You are a leader in the organization and need to be part of the solution.' [He] angrily responded, 'There are no leaders at MAW.'"

At the end of February, McCormick learned of a third incident that month involving Wacha. Two weeks earlier, around the middle of the month, he had been speaking with three female colleagues when one noticed his hair color and asked if he dyed it. Responding affirmatively, he said "the curtains had to match the rug," apparently indicating he dyed his hair to match the color of his pubic hair. Awkwardly realizing that the remark was inappropriate, Wacha added, "I guess that was TMI," a common reference to "too much information." One of the women told Gallagher about the off-putting interaction and then relayed it in an e-mail to McCormick, complaining that Wacha's comment was surprising, unwelcome, and "inappropriate."

McCormick brought the comment to the Board's attention in discussions on March 1, 3, and 4, 2016, as another example of Wacha's regressive conduct. The Board found the "rug" comment to be "highly inappropriate," in violation of MAW's anti-harassment policies, and of particular concern given that Wacha was head of human resources. After consulting with legal counsel, the Board decided "on or about March 4, 2016," to terminate Wacha's at-will employment, effective March 16.

Wacha was not notified of the decision until its effective date. The termination letter, which McCormick signed, stated, "This decision is based on your failure to comply with the terms of your Performance Improvement Plan dated October 22, 2014 and with the values of the organization as set forth in the Make-A-Wish

6

Employee Handbook.  You have exhibited disrespectful behavior to office staff and me including:  [¶]  • Outbursts in your office directed at [Gallagher];  [¶]  • Inappropriate comments to staff members; and  [¶]  • Insubordinate comments to me during a recent meeting."

Wacha felt "shocked and humiliated" by the manner in which he was fired when, during regular office hours, McCormick and the Board chairman, Michael Hickman, approached him in his office, told him he was terminated, handed him the termination letter, and refused to answer his questions, referring him only to the letter.  In marked contrast, according to Wacha, when he and McCormick had terminated three female employees, they were careful to do so off-site, allowing one of the employees who still had things at the office to retrieve them after hours, to save embarrassment and humiliation.

Yet when Wacha went to the storeroom to get a box for his things and he answered a coworker's question by stating he had been let go, Hickman admonished him: "That's not professional.  If you can't behave, we'll call the authorities and have you removed."  According to Wacha, an off-duty officer, whom McCormick and Hickman had brought in to be present for Wacha's firing, corralled the 12 other employees into a conference room, where McCormick directed them to remain while they were "releasing" Wacha.  Wacha viewed this as tantamount to holding his former peers, subordinates, and other employees "captive" for "30 to 45 minutes" as the "spectacle was unfolding," thereby "purposely humiliating" him.

According to Wacha, it was no coincidence that just hours before his firing he had e-mailed MAW's leadership team his final financial report for MAW's second fiscal quarter, showing an operating deficit of $557,686.00 at the end of February 2016.  The report would be included in materials provided to the Board's finance committee and the Board itself at their next meetings on March 22 and 23, 2016, respectively.  In addition to Wacha, the leadership team consisted of McCormick as CEO; Gallager as

7

director of wish and volunteer services; Sarah Pizzaruso as vice-president of development; and Debra Finster as vice-president of major gifts and legacy planning.

On three occasions in February 2016, Wacha had advised the leadership team of the substantial deficit and recommended that McCormick inform the Board to give them an opportunity to create a strategy to address it. He spoke with "urgency and concern" about the deficit in those meetings, which included a weekly leadership team meeting, a one-on-one meeting with McCormick, and individual conversations with Pizzaruso, Finster, and Gallagher. In at least two meetings with McCormick in late February and early March 2016, Wacha informed McCormick that Pizzaruso and Finster had told him they could not make up the deficit by the end of the fiscal year.

Wacha knew "it would be insubordination if I were to talk to the Board about the deficit without permission from Ms. McCormick, but I also knew that with only six months left in the fiscal year, it was vital that the Board be notified of MAW's fiscal condition so they could try to do something about it, if they determined to do so." As Wacha testified, however, McCormick, "didn't want to discuss it until the third quarter because she thought something would come in. Typically, we would get an inheritance." Wacha recalled that McCormick stated, "[S]omething might come, something always comes in," to which Wacha rejoined, "Hope is not a strategy."

When Wacha insisted, "I wanted the topic broached," McCormick answered, "Well, the [B]oard knows because they get the financials." Wacha nonetheless feared board members might not appreciate the issue, pointing out, "Yes, they do, but they don't know that we're in this position." He asked McCormick to "[j]ust bring it up. And if everybody says, 'Okay. Fine. We're aware of it,' then I'll drop it. I just want to make sure they're aware of it."

McCormick ignored his suggestion. Wacha testified that he "was going to address it at the next finance [meeting so that the Board could] have a discussion about it at the [B]oard meeting." Wacha did not state he informed McCormick of this plan, but

8

testified he told Finster and Pizzaruso "that if the issue did not get addressed at the next Board meeting, [he] would bring it up. Both Ms. Finster and Ms. Pizzaruso responded that [he] was going to get fired" if he did so.

In addition to his dispute with McCormick over discussing the deficit with the Board, Wacha believed he had been fired because he "discover[ed] that McCormick [w]as systematically misusing her corporate credit card." (Capitalization adjusted.) In October 2015, Wacha attended a national Make-A-Wish conference, where he learned of an upcoming audit scheduled for the Orange County and Inland Empire chapter in July 2016. After the conference, Wacha warned all MAW staff by e-mail to comply with MAW corporate policies regarding credit cards, including the necessity of submitting itemized receipts and not just the signed credit card receipt. Wacha's e-mail "featured two areas [for improvement], both of which applied to McCormick and her misuse of the Corporate Credit Card: (i) charges over $25 that did not have a detailed receipt and (ii) meal charges that did not have a detailed receipt along with the charge receipt."

Wacha observed in his review of monthly bills that McCormick used her MAW credit card several times a month, but failed to submit the required detailed receipts as much as 40 percent of the time. She used the card to make purchases for business, but Wacha believed she also used the card to make other purchases for herself, her spouse, and her friends. Wacha identified "meals" as the only category in which McCormick made personal purchases. According to Wacha, it was not unusual for McCormick to charge a meal that exceeded MAW's $50 per diem and fail to provide the supporting itemized restaurant receipt.

One transaction that stood out to Wacha was McCormick's use of her MAW card to charge $200 for a meal at an expensive restaurant in Palm Springs on a business trip on which her husband accompanied her. The meal exceeded the per diem limit and McCormick provided only the credit card charge slip. Over the two-year period before he was terminated, Wacha asked McCormick more than 12 times to provide

9

documentation for meals she purchased on her MAW credit card. Frustrated by McCormick's failure to cooperate, Wacha announced generally several times in her presence at staff meetings or other occasions that, when the time came for the audit, he would not lie for anyone not following the national Make-A-Wish financial policies.

Wacha also believed he had been terminated unfairly because Pizzaruso "was known to use profanity in the workplace," including an incident of insubordination where Pizzaruso, frustrated that McCormick had set a fundraising goal without consulting her, stated: "If she's going to make up numbers, she can raise the fucking money herself." Wacha "reported the incident to Ms. McCormick in an email and we talked about it," but McCormick "took no corrective action against Ms. Pizzaruso for her outburst."

Wacha contended that McCormick applied a double standard in which she did not uphold or enforce company values as applied to herself or other staff, but engineered his termination for purportedly failing to meet MAW values.

Wacha's operative second amended complaint set out his grievances in the form of seven causes of action: (1) wrongful termination in violation of public policy embodied in Labor Code section 1102.5, subdivision (b); (2) breach of the implied covenant of good faith and fair dealing; (3) gender discrimination in violation of the California Fair Employment and Housing Act (FEHA); (4) harassment based on HIV status in violation of FEHA; (5) harassment based on sexual orientation in violation of FEHA; (6) failure to prevent discrimination and harassment in violation of FEHA; and (7) IIED.

Wacha voluntarily dismissed the second and sixth causes of action. The trial court subsequently granted Make-A-Wish's motion for summary judgment on the remaining causes of action. Wacha appeals the trial court's ruling only as to his retaliation and IIED claims.

10

## DISCUSSION

1.    *Retaliatory Termination; Applicable Summary Judgment Principles*

Because direct evidence of an employer's retaliatory intent is rare, California courts have adopted the burden-shifting test the United States Supreme Court established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 for trying retaliation claims based on circumstantial evidence. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*); *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 (*Serri*).) This burden-shifting process, through "'successive steps of increasingly narrow focus,'" can be useful in determining whether retaliation may "'be inferred from facts that create a reasonable likelihood of [a retaliatory intent] and are not satisfactorily explained.'" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159 (*Wills*).) The parties' respective burdens at trial on a retaliatory termination claim affect the applicable summary judgment procedure. We therefore briefly review those burdens.

At trial, the terminated employee must show actions by the employer from which it may be inferred that it is more likely than not that the employer subjected the employee to an adverse employment action in retaliation for engaging in protected activity. (See *Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 965; *Wills*, *supra*, 195 Cal.App.4th at p. 159.) Fundamentally, the employee must demonstrate "a causal link existed between the protected activity and the employer's action." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109.) A satisfactory prima facie showing by the employee gives rise to a presumption of retaliation that, if not answered by the employer, is mandatory and requires judgment for the employee. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042; see *Serri*, *supra*, 226 Cal.App.4th at p. 860.)

"If the employer produces substantial evidence of a legitimate, [nonretaliatory] reason for the adverse employment action, the presumption of

11

[retaliation] created by the prima facie case "'simply drops out of the picture'" [citation] and the burden shifts back to the employee to prove intentional [retaliation]." (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68.)

In light of the foregoing trial burdens, when an employer seeks summary judgment on a retaliation claim, the employer "'has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, [nonretaliatory] factors.'" (*Serri*, *supra*, 226 Cal.App.4th at p. 861; *Swanson v. Morongo Unified School Dist., supra,* 232 Cal.App.4th at p. 966.) When the employer meets that burden by establishing a legitimate, nonretaliatory reason for its decision, the burden shifts to the employee to establish a triable issue on whether that reason was a pretext for retaliation. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1061; *Serri*, at p. 861.)

To meet that burden, the employee must produce substantial evidence that both shows the employer's stated reasons for its actions were untrue and from which a reasonable trier of fact could conclude the employer engaged in unlawful retaliation. (*Serri*, *supra*, 226 Cal.App.4th at p. 861; *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1529 (*McGrory*).) "Logically, disbelief of an [e]mployer's stated reason for [an adverse employment action] gives rise to a compelling inference that the [e]mployer had a different, unstated motivation, but it does not, without more, reasonably give rise to an inference that the motivation was a prohibited one." (*Id.* at pp. 1531-1532.)

Accordingly, "'[a]n employee in this situation can not "simply show the employer's decision was wrong, mistaken, or unwise."'" (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834 (*Batarse*).) "The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Mamou v. Trendwest Resorts, Inc*. (2008) 165 Cal.App.4th 686, 715 (*Mamou*).) "'[T]he

12

inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.'" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)

In this context, the Supreme Court has emphasized that '"an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was [retaliatory].' [Citation.] It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to [retaliatory] motive. [Citations.] Rather it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or [retaliatory motive] on the part of the employer." (*Serri*, *supra*, 226 Cal.App.4th at pp. 861-862.) "A motion for summary judgment should be granted if the submitted papers show that 'there is no triable issue as to any material fact,' and that the moving party is entitled to judgment as a matter of law.'" (*Myers v. Trendwest Resorts, Inc*. (2007) 148 Cal.App.4th 1403, 1409.)

2. *Standard of Review*

Our review is de novo. (*Wills*, *supra*, 195 Cal.App.4th at p. 161.) "We are not bound by the trial court's stated rationale, but independently determine whether the record supports the trial court's conclusion that the plaintiff's [retaliation] claim failed as a matter of law." (*Ibid*.) "'"[T]he evidence must be incapable of supporting a judgment for the losing party in order to validate the summary judgment."'" (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 308.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing h[is] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) We do

not consider evidence "to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)

3.  *Requisite Prima Facie Showing*

The plaintiff's prima facie showing to support a retaliation cause of action must include evidence "'that [he] engaged in protected activity, that [he] was thereafter subjected to adverse employment action by [his] employer, and there was a causal link between the two.'" (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1125.) Wacha identified Labor Code section 1102.5, subdivision (b), and Corporations Code section 5231 as the source of state public policy protecting against employer retaliation under the circumstances present here.

Specifically, the Labor Code section provides in relevant part that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, *or because the employer believes that the employee . . . may disclose information . . .* to a person with authority over the employee," provided that "the employee has reasonable cause to believe that the information discloses a violation of [a] *state . . . statute . . . .*" (§ 1102.5, subd. (b), italics added.)

For the alleged statutory violation, Wacha relied on the fact that the Corporation Code requires corporate directors to exercise their duties "in good faith . . . and with such care . . . as an ordinarily prudent person in a like position would use under similar circumstances." (§ 5231, subd. (a).) Wacha reasoned that this provision implicitly extended a similar state-mandated statutory duty of fiduciary care to non-directors like McCormick because "[c]orporate officers owe fiduciary duties that are identical to those owed by corporate directors."

Wacha alleged in his second amended complaint that McCormick breached her fiduciary duty of care to MAW in two respects. First, she "had a fiduciary duty to inform the Board of Directors about the $600,000 deficit and to . . . discuss[] the financial position of defendant Make-A-Wish in a timely fashion to ensure that the Board had a

14

full understanding of the risks that threatened the organization's fiscal health and so that the Board could take action to address those risks."

Second, her alleged use of a Make-A-Wish credit card for "personal enjoyment and convenience," together with her failure "to account for and to reimburse [MAW] for the personal expenditures that she incurred," along with her failure "to cooperate with her subordinates" (presumably Wacha) in accounting for these expenditures constituted a breach of fiduciary duty owed to MAW "and [to] its stakeholders, the donating public and the children that the organization serves."

Wacha alleged McCormick orchestrated his termination because she feared he "was going to disclose to the auditors of the national Make-A-Wish organization" her alleged credit card abuse and "to prevent him from bringing the deficit to the Board's attention, in violation of California Labor Code § 1102.5(b) and the public policy under California Corporations [Code] § 5231, which pr[e]scribes defendant McCormick's fiduciary duties to the Board and to defendant Make-A-Wish."

We observe that it is not clear that the cited Corporations Code section prescribes fiduciary duties for corporate *officers*—to whom it does not refer—or that it creates a statutory duty of fiduciary care for such officers to their corporation, resulting in the Labor Code applying to "disclos[ures of] a violation of [the] state . . . statute." (Lab. Code, § 1102.5, subd. (b).) In essence, Wacha asserts that every fiduciary duty violation by a corporate officer constitutes a violation of state law—a broad proposition indeed for a statute that is silent on the subject. The trial court apparently assumed Wacha's intended disclosures constituted protected activity under the provisions he cited; we will therefore do the same.

But in doing so, our analysis is informed by the wide leeway afforded in the exercise of fiduciary duties by the very statute Wacha cites. Under that statute, a *director*—and therefore also a corporate officer, according to Wacha—properly fulfills his or her duties by acting "in a manner that [the] director [or officer] *believes* to be in the

15

best interests of the corporation . . . ." (Corp. Code, § 5231, subd. (a), italics added.) As we discuss, this bears on our consideration of Wacha's claim that the budget shortfall had to be disclosed to the Board when Wacha saw fit, despite McCormick's alternative plan.

4. *Summary Judgment Analysis*

Wacha contends the trial court erred in concluding he failed "to produce 'specific' and 'substantial' evidence of pretext" to demonstrate, as the court phrased it, "that Defendants' claimed reasons were not its true reasons . . . and that his termination was motivated by retaliatory animus." We find no error in the court's ruling.

Wacha attempts to deconstruct in minute detail the stated reasons for his termination. But in the context of at-will employment, it is not enough to attack the employer's rationale for dismissal as "[in]adequately substantiated"; to the contrary, that "is not the standard . . . when an at-will employee is terminated." (*McGrory*, *supra*, 212 Cal.App.4th at pp. 1532-1533.) Rather, the guiding principle is that "'there must be evidence supporting a rational inference that *intentional* [retaliation] . . . *was the true cause of the employer's actions*.'" (*Id.* at p. 1531.) Or, put another way, "Unless at-will employers are to be held to a good-cause standard for termination, no inference of discrimination can reasonably be drawn from the mere lack of conclusive evidence of misconduct by the employee." (*Id.* at p. 1533.)

It is true that "'[p]roof that the employer's proffered reasons are unworthy of credence may "considerably assist" a circumstantial case of [retaliation], because it suggests the employer had cause to hide its true reasons.'" (*McGrory*, *supra*, 212 Cal.App.4th at p. 1531.) Accordingly, the plaintiff must "'"""demonstrate *such* weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [. . . asserted] [nonretaliatory] reasons.'"""'" (*Batarse*, *supra*, 209 Cal.App.4th at p. 834, first italics added.)

16

Here, there was undisputed evidence of Wacha's misconduct. Indeed, during oral argument Wacha's counsel agreed that his "rug" comment was inappropriate and might have warranted his termination. But whether such conduct *warranted* termination was not the question in light of his at-will status, since that was his employer's prerogative. (*McGrory*, *supra*, 212 Cal.App.4th at p. 1531.) Instead, it was incumbent on Wacha to demonstrate that despite reasonable grounds for his dismissal when none were required, he was actually fired in retaliation for protected conduct. "The central issue" always "remain[s] . . . evidence [of] retaliatory animus." (*Mamou*, *supra*, 165 Cal.App.4th at p. 715.) We turn to Wacha's contentions to evaluate whether he met that standard.

Contrary to what counsel conceded during oral argument, Wacha asserts pretext is evident here because "the 'rug' remark alone . . . was insufficient to support [his] termination, so [McCormick] used it to manufacture a case." (Capitalization adjusted.) But Make-A-Wish did not premise Wacha's firing solely on the "rug remark." Instead, three incidents of inappropriate and unprofessional conduct in February 2016 preceded Wacha's termination in mid-March 2016. Those incidents included (1) his "very unpleasant and very unprofessional" conduct in late February dismissing staff safety concerns in the Riverside office under his supervision; (2) insubordinate comments to McCormick around the same time stating he "doesn't need to be part of the solution," "was not going to play this game," and otherwise indicating he would not perform his job duties; and, finally, (3) the rug comment.

The February cluster hearkened back to the necessity of PIP discipline less than a year and a half earlier, in October 2014. Wacha conceded all the reasons underlying the PIP had been substantiated and formed a proper basis for discipline at the time. By its nature, the necessity of a PIP for a high-ranking executive created a high bar for Wacha to demonstrate retaliatory intent, given that MAW needed no reason to fire him. Regressive conduct could only be viewed as an aggravating factor. The PIP

17

procedure did not change Wacha's at-will status.  Against this backdrop, Wacha's summary judgment opposition failed to create a triable issue of fact on whether the three reasons MAW gave for his subsequent termination—considered singly or together in light of the evidence as a whole, including the PIP—actually masked an unlawful retaliatory intent to fire him.

Specifically, there was no triable issue of fact as to pretext or retaliatory intent based on the office security issue.  Wacha contends the account Gallagher gave of his poor response to the concerns she raised on behalf of the Riverside staff "was not the entire story" and "[m]ore importantly, . . . McCormick *was aware* that Gallagher's story was not complete" because she herself had "resolved the security issues that Gallagher brought up the year before."  According to Wacha, this raised "the inference that McCormick exaggerated the disagreement between Wacha and Gallagher to paint a false picture of Wacha as being disrespectful and unprofessional and having an 'outburst' when he reacted to Gallagher's previously-rejected-at-the-highest-level complaint about security."

The evidence, however, showed that Gallagher raised the security issue, not McCormick, and that Gallagher, not McCormick, reported his response when faced with a serious staff concern.  Wacha "became very agitated" and reacted in a "very unpleasant . . . and very unprofessional" manner, including advising her that "he would not take any of the complaint calls regarding the doors" and that "the girls need to grow up and be adults."  Wacha admitted he was "shocked and upset" at Gallagher's request, but characterized his "grow" comment as, inscrutably, "an opportunity for us to help them [i.e., the Riverside staff] grow."  Although he disagreed with Gallagher, he called a contractor after their meeting to have a security door installed.

McCormick had approved opening the Riverside office after confirming with police that it was not in a high crime area.  But that did not "resolve" staff safety concerns as Wacha claimed.  Moreover, Wacha was the project manager for the new

18

office build-out and move in. Yet he told Gallagher he would not hear further staff concerns on the door security issue, referring them instead to McCormick ("Stephanie . . . would have to take those"). No reasonable factfinder could find pretext or an unlawful retaliatory intent to fire Wacha when, as director of operations with a prior PIP for unprofessional interactions with staff, he became "shocked and upset" at having to address a safety issue.

Similarly, nothing indicated pretext or retaliatory intent in McCormick's reference to "insubordination" as a second basis for termination. Again, Wacha argues that "his testimony" in opposition to summary judgment "provided context" to his failure to provide McCormick the cash flow forecast she requested and to his comment that he was "not going to play this game." Wacha explained that he meant his "game" comment to refer to McCormick "pushing [a] false narrative" that he did not get along with Pizzaruso. The context also included Wacha's insistence that "*McCormick* needed to tell Pizzaruso to furnish the needed information" so that Wacha could forecast cash flow. (Italics added.) In any hierarchical organization, but particularly in the at-will context here, it is difficult to see how a rational factfinder could conclude that Wacha telling McCormick that she needed to do his job constituted evidence of pretext or unlawful retaliatory intent.

There was similarly no evidence of pretext or unlawful retaliation in MAW's reliance on his "rug" comment as a third reason for letting him go. Wacha cites as contrary evidence MAW's failure to investigate the comment thoroughly under its anti-harassment guidelines; McCormick's characterization of the comment as "highly offensive" when Gonzalez had only labeled it "inappropriate" in an email; and MAW's failure to take "immediate" action on the comment, while later exaggerating its seriousness purportedly because he was a senior executive—all without providing him a rebuttal opportunity to forestall termination. Wacha contends these failings manifested "a willingness to exaggerate" a "minor infraction" into the "centerpiece" of McCormick's

19

campaign against him, thereby revealing pretext and "rais[ing] an inference that the facts that underlie the reasons for [his] firing are suspect."

We are not persuaded there is any material triable issue of fact regarding the comment. There was little to investigate. Wacha concedes he made the comment, that it was inappropriate, that Gonzalez was offended, and that she reported it to Gallagher and then to McCormick. "'Where the employment contract itself allows the employer to terminate at will, its . . . lack of care in doing so are, in most cases at least, irrelevant.'" (*McGrory*, *supra*, 212 Cal.App.4th at p. 1533.)

Moreover, despite counsel's contrary assertion during argument, there was no meaningful investigatory failure or delay in Wacha's termination to suggest an ulterior motive. McCormick learned of the comment on February 26 from Gallagher, confirmed with Gonzalez via email that it occurred, discussed the comment and Wacha's "regression to his pre-PIP demeanor and conduct" with the Board and legal counsel the next week, resulting in the Board's determination "on or about" March 4 to terminate Wacha. That decision became effective on March 16.

Additionally, while Wacha regards the comment as minor, there is no indication the Board or McCormick took it lightly. In *Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, the plaintiff's supervisors directed her to affix their signatures on reports for the sake of convenience, but then terminated her for falsifying those reports after she alleged sexual harassment and cooperated in a company investigation. (*Id.* at pp. 1148, 1153.) Here, in contrast, the Board terminated Wacha less than three weeks after learning of his offensive comment, which McCormick had promptly brought to the Board's attention, capping a cluster of incidents showing regressive behavior.

Wacha argues that the Board's heightened concern about just one comment as "highly inappropriate and unprofessional" for a human resources director was a disproportionate response to a "minor infraction." But characterizing the matter as a "minor infraction" does not make it so, nor does it alter the reality the Board faced.

20

Wacha suggests any apprehension about legal liability was overstated. As in *McGrory*, however, "Employee provides no authority requiring an Employer to retain an at-will employee until his conduct creates civil liability." (*McGrory*, *supra*, 212 Cal.App.4th at p. 1528.)

Pointing to this court's ruling in *Colarossi*, Wacha contends his disparate treatment compared to Pizzaruso demonstrated pretext. We disagree. Pizzaruso was not similarly situated. "Different types and degrees of misconduct may warrant different types and degrees of discipline." (*McGrory*, *supra*, 212 Cal.App.4th at p. 1536 [quotation marks omitted].) "No inference of discrimination reasonably arises when an employer has treated differently different kinds of misconduct by employees holding different positions." (*Ibid*.)

Unlike Wacha, Pizzaruso was not the head of human resources at a prominent corporation who undermined himself and his employer in that role. She did not incur major discipline twice in 18 months for clusters of serious transgressions. Her use of profanity is not comparable to the depth and breadth of misconduct necessitating Wacha's PIP, nor to his regression in multiple categories. While Pizzaruso expressed frustration with the fundraising goal McCormick set for her, there was no evidence she failed or refused to perform her job—as Wacha did on at least three occasions for important executive responsibilities. Pizzaruso committed no fireable offenses, while Wacha by his own admission engaged in several, despite his at-will status. No reasonable juror could find pretext in MAW's decision to terminate Wacha and not Pizzaruso.

Wacha's claim of pretext must also be assessed in light of his evidence of retaliation, which was weak. Wacha asserts the trial court "overlooked [his] evidence of the causal connection between [his] protected activity and his firing," which consisted primarily of the timing of his dismissal on the eve of a Board hearing and a national audit a few months later. The evidence, however, suggested McCormick had little or no reason

21

to regard him as a whistleblower on a violation of state law or regarding the corporate budgetary matters on which he premises his claim.

Specifically, Wacha told individuals (Finster and Pizzaruso) other than his supervisor that he would personally provide notice of a budget shortfall to the Board "at the *next* board meeting" *if* McCormick did not do so at a pending meeting. But the "next" board meeting would be at or near the same time McCormick told Wacha that she planned to delve into the same shortfall with the board, i.e., at the end of the third fiscal quarter. MAW's board meetings took place every other month. That meant if McCormick did not discuss the budget shortfall at the March meeting, the next meeting would be in April or perhaps May. The premise of Wacha's retaliation claim is that McCormick "did not want to bring attention to the [d]eficit until the end of the Third Quarter, May 31, 2016." This near overlap of the end of the third quarter coinciding with the next board meeting undermined any notion McCormick harbored a retaliatory intent.

Even assuming Wacha meant he would disclose the deficit to the Board at its March 2016 meeting if McCormick did not do so at that same March meeting, the undisputed evidence showed the Board already had the shortfall information in its written budget reports, as McCormick reminded Wacha. Additionally, we do not see a colorable claim of breach of fiduciary duty—and certainly not one rising to the level of a violation of state law—where the alleged breach consisted of a matter wholly within McCormick's discretion. Wacha recognized McCormick's discretionary authority when he conceded it would be insubordination for him to go over McCormick's head to the Board.

This is particularly true where Wacha offered no plan to close the budget deficit. It was not as if McCormick breached a fiduciary duty to look out for MAW's best interests by overlooking or declining to take a funding opportunity to the Board. Wacha criticized as "not a strategy" McCormick's "hope" that funding would come through in the form of an "inheritance" (presumably a willed gift). But Wacha's professed intent to lay the matter at the Board's feet without a plan was, to use his words,

22

"not a strategy" either. Nor does Wacha cite any evidence that Make-A-Wish was required by state law or its own corporate charter to operate in the black on an annual basis, or that it could not turn to bridge financing or other alternatives if necessary.

As noted at the outset, under the very statute on which Wacha relies, a corporate director—and therefore also a corporate officer—properly fulfills his or her duties by acting "in a manner that [the] director [or officer] *believes* to be in the best interests of the corporation . . . ." (Corp. Code, § 5231, subd. (a), italics added.) Wacha failed to present any evidence McCormick disbelieved she was acting in Make-A-Wish's best interests by deferring the budget shortfall discussion until the next quarter. Even in suggesting he believed it was preferable to address the budget shortfall immediately with the Board, Wacha testified: "I did not say that I was going to report her. I did say that I was going to bring the topic up at the meeting, at the board meeting." He testified he did not recall "ever learn[ing] that anybody believed that Ms. McCormick had breached her fiduciary duties in any way" or that he had ever told anyone he suspected that any employee was "engaged in conduct [he] believed violated the law."

The evidence similarly showed no obfuscation by McCormick to thwart an upcoming internal audit. There was likewise no evidence she hid, or attempted to hide any information, or requested Wacha to hide information or lie regarding the fact that she had provided only one instead of two receipts for a meal or meals. In sum, the trial court did not err in granting summary judgment based on the parties' respective showings, or lack thereof, regarding retaliation and pretext.

5.    *IIED*

Wacha contends the trial court erred in finding his IIED claim based on the manner in which he was terminated failed as a matter of law. MAW argues that such claims are preempted by workers' compensation law in the context here or, in the alternative, that the alleged conduct was not extreme or outrageous as required to

23

constitute IIED.  Because we agree with the latter contention, we need not and do not address preemption.

To prove IIED, a plaintiff must show:  "'"'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . .'  Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community."  [Citation.] [And] [t]he defendant must have engaged in "conduct intended to inflict injury or engaged in with the realization that injury will result."'"  (*Potter v. Firestone Tire & Rubber Co*. (1993) 6 Cal.4th 965, 1001.)

Here, where Wacha cannot prove his retaliation or pretext claims, we conclude no reasonable factfinder could find merit in his IIED claim.  As a matter of law, the imposition of appropriate workplace discipline does not constitute extreme or outrageous conduct, and this principle applies perforce to Wacha's termination. (*Buscemi v. McDonnell Douglas Corp.* (9th Cir. 1984) 736 F.2d 1348, 1352; *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 25.)

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.